**STATE of Missouri, Plaintiff/Respondent,**

v.

**Arlee HAYES, Defendant/Appellant.**

**No. ED 95350.**

Missouri Court of Appeals, Eastern District, Division Three.

Sept. 6, 2011.

Timothy A. Blackwell, Jefferson City, MO, for Plaintiff/Respondent.

Andrew E. Zleit, St. Louis, MO, for Defendant/Appellant.

SHERRI B. SULLIVAN, J.

*Introduction*

Arlee Hayes (Appellant) appeals from the trial court's judgment entered after a bench trial convicting him of second-degree murder and abuse of a child resulting in death. We affirm.

On April 23, 2010, the State charged Appellant with second-degree murder or felony murder (Count I) as a result of the perpetration of the class A felony of abuse of a child (Count III) and, in the alternative, with second-degree murder or felony murder (Count II) as a result of the perpetration of the class C felony of second-degree assault (Count IV). Appellant waived his right to a jury trial and, in June 2010, the cause proceeded to trial. Viewed in the light most favorable to the verdict, the following evidence was adduced.

In May 2009, Kimberly Sanchez (Sanchez) and Appellant lived in an apartment together with their infant son, Arlee Jr. (Arlee), and Sanchez's 22–month–old daughter, Sophia. Sophia was a very energetic child and was good at walking. Sophia would trip and stumble sometimes, but she never sustained any serious injuries from tripping. Sophia liked to play in the bathtub, and would dip her face in the water and quickly "pop up" and laugh. Sophia was comfortable in the bathtub and would stand, sit, and pull herself up.

On May 25, 2009, Appellant went to work in the morning and Sanchez stayed at home with the children. Sanchez bathed and dressed Sophia, and then fixed Sophia's hair. Sanchez did not see anything wrong with Sophia and did not notice anything of concern on Sophia's head. There was nothing unusual about Sophia's behavior and Sophia did not fall, trip, tumble or have any tantrums where she hit her head that day.

Appellant got home from work around 4:00 p.m. and then drove Sanchez to work. When Sanchez left she did not notice any bumps, bruises, scratches, or scrapes on Sophia. Sanchez talked to Appellant on the phone a few times while she was at work, and he never indicated that anything was wrong. Appellant picked Sanchez up from work between 1:30 and 2:00 a.m. on May 26, 2009. The children were in their car seats in the back seat of the car. Arlee was awake but Sophia appeared to be sleeping.

When they arrived home, Appellant carried Sophia inside and put her in her crib. Sanchez noticed that Sophia was not wearing the same clothes she had been wearing earlier in the day, but this was not unusual because Appellant would sometimes give Sophia a bath or change her, especially if she urinated on herself while sleeping. Sanchez carried Arlee inside, fed him and put him to bed. Before going to bed, Sanchez checked on Sophia. Sophia was covered up and appeared to be sleeping, so Sanchez did not touch her for fear of disturbing her. Appellant never mentioned that anything was wrong.

Around 7:00 a.m., the alarm went off and Sanchez woke Appellant. Sanchez stayed in bed after Appellant got up. Approximately 20 minutes later, Appellant came into the room and sat down next to San-

chez. Appellant was crying, and Sanchez asked Appellant what was wrong. Eventually, Sanchez asked Appellant if something was wrong with Sophia and Appellant nodded. Sanchez found Sophia lying on the kitchen floor, swollen, stiff, and cold.

Sanchez asked Appellant what had happened, and he said that he was giving Sophia a bath around 11:00 p.m. the prior evening when he left her to answer the phone. Appellant told Sanchez that when he returned approximately six minutes later, Sophia was under the water. Appellant stated he pulled Sophia out of the water and performed CPR for an hour. Sanchez asked Appellant why he did not call someone for help and Appellant did not respond. Sanchez and Appellant waited to call the police until they had cleaned their apartment because it was very messy and Sanchez was afraid that the authorities would have Arlee taken away from her. Sanchez testified that Appellant was right-handed and that he wore a ring on his right hand every day.

Sergeant Donna Garrett (Garrett), a detective in the child abuse unit with the St. Louis Police Department, responded to the scene. In Garrett's training and experience, a child of Sophia's age should be able to stand, sit, and pull herself up into a standing position while in the bathtub. Garrett observed numerous injuries to Sophia's head, which were inconsistent with a single fall. Appellant told Garrett that he left Sophia unattended for a couple of minutes in approximately six to eight inches of water but provided no explanation for Sophia's head injuries.

Police seized the cover to Sophia's car seat. Presumptive tests indicated that areas of the cover were positive for the presence of apparent blood and DNA testing indicated it was a mixture of Sophia's DNA with a trace of DNA from a second individual.

Dr. Jane Turner (Turner), an assistant medical examiner for the City of St. Louis, performed the autopsy on Sophia. Sophia had 18 contusions, abrasions, or a combination thereof centered about the crown of her head, and additional injuries to the corners of her lips. The injuries appeared fresh, and no scabbing had developed. When the scalp was reflected back, Turner observed hemorrhages corresponding to the external injuries. The presence of intact red blood cells and the absence of chronic inflammatory cells put the infliction of the injuries anywhere between a few hours to three days before death. However, a microscopic examination revealed acute inflammatory cells, suggesting the injuries occurred only a few hours before death. Based on this evidence, Turner opined that the injuries were most likely no more than a few hours old.

Sophia had a small amount of swelling of her brain, which could have been caused by multiple blunt impact forces to her head or by drowning. Sophia also had a froth cone coming out of her nose. A froth cone develops as a result of pulmonary edema, or water in the lungs, which is seen in drowning deaths. Turner determined that the cause of death was drowning and that the manner of death was homicide.

Turner opined that the numerous injuries to Sophia's head were inflicted injuries and were not accidental. The injuries were not consistent with a child smacking her head during a temper tantrum, a fall in the bathtub, or a single strike. Instead, Sophia's injuries were consistent with multiple blows from a fist. One of Sophia's injuries appeared to have a pattern similar to the pattern of a ring worn by Appellant every day. Specifically, Turner testified that Sophia had a small diamond– or cross–shaped abrasion onto which Appellant's ring could be superimposed.

Based on her medical training, Turner believed a child of Sophia's age, size, and development could avoid drowning in six to eight inches of water. Turner testified that Sophia should have been able to get up out of the water herself but that the blows to her head could have caused her to lose consciousness or someone could have held her under the water. Turner testified that there was no physical evidence to support a conclusion that Sophia was held down under the water. Although Turner could not say from the autopsy whether Sophia was actually unconscious when she went under the water, Sophia's head injuries could have caused her to become lethargic, unresponsive, or unconscious. Turner stated that Sophia's head injuries "possibly" had something to do with Sophia's submersion in the water.

The trial court found Appellant guilty on Counts I, second-degree murder, and III, abuse of a child. The court found that Appellant hit Sophia on the head; placed her in the bathtub to clean her up; possibly left Sophia unattended in the bathtub; and, as a result of her injuries, Sophia either lost consciousness and drowned or was unable to save herself from drowning. The court also found that Sophia's injuries reflected strikes that were cruel and inhuman. The court sentenced Appellant to two concurrent fifteen-year sentences. This appeal follows.

### Points Relied On

In his first point on appeal, Appellant argues the trial court erred in overruling his motion for judgment of acquittal at the close of all evidence because there was insufficient evidence to support the convictions, in that the State failed to prove beyond a reasonable doubt that Sophia died as a result of any acts on the part of Appellant. Appellant argues that the court's determination of guilt was the product of forced or speculative inferences and was unsupported by the evidence.

In his second point on appeal, Appellant argues the trial court abused its discretion in overruling his motion for a continuance, in that the trial court erroneously concluded that the State would not proceed on counts that the State, in fact, proceeded on; and failed to consider Appellant's request for time to investigate the cause of Sophia's injuries in the context of the facts of the case, including that the evidence would show bruising on the victim's scalp, and the autopsy doctor had been given Appellant's ring to compare to injuries to Sophia's scalp only one week before trial.

### Discussion

#### Sufficiency of the Evidence

On review of a challenge to the sufficiency of the evidence, this Court is limited to determining whether the evidence was sufficient for a reasonable person to find the appellant guilty beyond a reasonable doubt. *State v. Rousan,* 961 S.W.2d 831, 841 (Mo. banc 1998). We view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the verdict. *Id.* This court does not reweigh the evidence. *State v. Johnson,* 316 S.W.3d 491, 495 (Mo.App. W.D.2010).

Section 565.021.1(2)[1] provides that a person commits the crime of second-degree murder if he commits or attempts to commit any felony, and, in the perpetration or attempted perpetration of such felony, another person is killed as a result of the perpetration or attempted perpetration of such felony. Section 568.060 provides that a person commits the crime of abuse of a child if he knowingly inflicts cruel and inhuman punishment upon a child less than seventeen years old. Section 568.060.1(1). The crime of abuse of a child

---

1. All statutory references are to RSMo 2006.

is a class C felony, unless the child dies as a result of the injuries sustained, in which case it is a class A felony. Section 568.060.3.

 The State has the burden of establishing the *corpus delicti. State v. Edwards,* 116 S.W.3d 511, 544 (Mo. banc 2003). In a homicide case, the *corpus delicti* consists of two elements: (1) proof of the death of the victim, and (2) evidence that the criminal agency of another caused the victim's death. *Id.* These elements may be proven by circumstantial evidence, but are not established until it has been proved that the death was not self-inflicted, due to natural causes, or an accident. *Id.* "The *corpus delicti* cannot be presumed and must be proved by legal evidence sufficient to show that the crime charged has been committed by someone." *Id.*

 "Circumstantial evidence is evidence which does not directly prove a fact in issue, but gives rise to a logical inference that the fact exists." *State v. Fitzgerald,* 778 S.W.2d 689, 691 (Mo.App. E.D. 1989). " 'Circumstantial evidence and permissible inferences from it are acceptable, and generally will provide the necessary proof.' " *State v. Candela,* 929 S.W.2d 852, 868 (Mo.App. E.D.1996) quoting *State v. Harris,* 854 S.W.2d 853, 856 (Mo.App. E.D. 1993). "[A]lthough the State has the burden to prove the defendant's criminal agency beyond a reasonable doubt, that burden does not apply to every link in the chain of circumstances, but only to the whole issue." *State v. Letterman,* 603 S.W.2d 951, 954 (Mo.App. S.D.1980).

 On appeal, Appellant argues the State's evidence did not establish the *corpus delicti,* in that there was no evidence that any criminal acts by him caused Sophia's death, nor was there sufficient evidence that Sophia's death was not accidental. Appellant contends the State failed to prove beyond a reasonable doubt that his conduct caused Sophia's death as there was no demonstrated causal connection between any child abuse and Sophia's death by drowning. We disagree.

 The State presented sufficient evidence from which a reasonable person could conclude that Appellant caused Sophia's injuries and that Sophia drowned as a result of those injuries. Sophia did not have any injuries to her head when Sanchez left Sophia in Appellant's care on the day of her death. Turner testified that Sophia sustained 18 forcible blows to the head within a few hours of her death, during which time Sophia was in Appellant's sole care. In addition, one of Sophia's head injuries bore a pattern similar to a ring worn by Appellant. It is beyond dispute that inflicting 18 forcible blows to the head of a 22–month–old child is cruel and inhuman punishment amounting to child abuse pursuant to Section 568.060.1(1).

Furthermore, Appellant's contention that Sophia's drowning when he left her alone in the bathtub was nothing more than an accident, unrelated to any criminal agency on his part, is belied by the record. The State presented substantial evidence that a child of Sophia's age and size would be able to sit or stand up to avoid drowning in the bathtub and that, under normal circumstances, Sophia could sit and stand up on her own in the bathtub. Turner testified that Sophia should have been able to have gotten out of the water by herself but that her head injuries could have caused her to become lethargic, unresponsive, or unconscious. Moreover, Appellant not only made no attempt to seek any outside help for Sophia following the incident, but also went to substantial lengths to conceal Sophia's death, going so far as to dress and stage Sophia's body as to appear normal and sleeping.

Based on this evidence a reasonable person could have concluded that Appellant's infliction of 18 forcible blows to the head of a 22–month–old child and then leaving her unattended, in a compromised state, in a bathtub of water was cruel and inhuman punishment and that Sophia died in the perpetration of such felony. Based on the foregoing, Appellant's Point I is denied.

### Motion for Continuance

■ Prior to the start of trial, the following exchange occurred as to Appellant's request for a continuance:

THE COURT: All right. Mr. Hayes, your attorney has indicated to me that you wanted to speak to the Court. We are on the record and you may proceed at this time.

THE DEFENDANT: I was just trying to get an extension and a different court date to get some more information.

THE COURT: What information?

[THE DEFENDANT]: Look on the case because I got some different information, and I was trying to get further investigated. I just recently got that first thing Thursday that I didn't even know.

THE COURT: You have to be a little bit more specific than that, Mr. Hayes, because this case has been pending since May 2009.

[THE PROSECUTOR]: May 27th.

THE COURT: May 27th, '09, over a year ago.

THE DEFENDANT: I've had bits of pieces of it, and like just now my attorney just got different information, some more information, and I'm just—

THE COURT: What information did you receive that would change being ready to proceed with trial today?

THE DEFENDANT: That there were some marks on my daughter's head and they said it could have been like three days old or something, so they don't know where it came from and all that other stuff so I want to try and see if we could investigate on that.

THE COURT: Is that new information?

THE DEFENDANT: It's new to me. I'm sorry.

[THE PROSECUTOR]: Your Honor, Dr. Turner was deposed in April, is that a correct date?

[DEFENSE COUNSEL]: Yes.

THE COURT: April of '09 or—

[THE PROSECUTOR]: April of 2010, and any information with injuries to the head would have come from Dr. Turner, so I know [Defense Counsel] has been in possession of the autopsy report and her deposition for sometime.

THE COURT: And have you, [Defense Counsel], had an opportunity to look at it and consider the testimony of Dr. Turner in preparation of trial?

[DEFENSE COUNSEL]: Yes, ma'am.

THE COURT: Is there anything else, Mr. Hayes?

THE DEFENDANT: Besides that, like not really. I just been given like bits and pieces, and it's been changing, and like first they say the cause of death was one thing, and then six months later they say it's another thing.

THE COURT: All right. You talking about the fact that they reindicted you; is that what you are talking about?

THE DEFENDANT: No. I am not talking about that. I'm just talking about like when I was locked up he said it was like the cause of death was physical injury, and they said like six, eight months later that she drowned, and it's just been changing like ever since I've been here it's just been like something different.

THE COURT: You realize that you have been charged with murder second in the alternative of murder second. The first murder second being that your daughter drowned as a result of abuse. The second one is that in the alternative, meaning one or the other. They are not charging you with two separate murder seconds. They are charging you with one murder but defining it two different ways. One being that your daughter drowned as a result of abuse. The second being that your daughter drowned due to the assault second where they have alleged that you struck her, and I am assuming that that is the injuries that you're saying to the back of the head.

[THE PROSECUTOR]: The assault second is for pushing her, causing her head to strike the crib, Your Honor.

THE COURT: Very well.

. . .

THE DEFENDANT: So, I just wanted to say—

THE COURT: So I understand that. They have alleged one or two ways of how your daughter's injuries caused her to drown.

THE DEFENDANT: Yeah, and you say the injuries, and then like Thursday, like five days ago they just gave the information that the injuries could have been three days old, so I don't really know.

THE COURT: All right, but you understand that those are matters for which your attorney will cross-examine the experts on?

A. Yeah.

THE COURT: In defense of your case?

THE DEFENDANT: Yeah, I mean that's true, but I feel we can still do some further investigation to try to pinpoint somebody towards that instead of just, you know, just going in there and saying, oh, well they were just three days old. I feel that we can really investigate this and find out where those bruises really came from.

THE COURT: Well, I understand that you are saying that you've been told different things, and you understand that the State can elect which one of those murders they want to proceed on. They may not proceed on the one that you are referring to with the bruises. They may proceed on the other one. Would that be the first one?

[THE PROSECUTOR]: The pushing.

THE COURT: The pushing. Just the fact that the child was pushed.

THE DEFENDANT: I didn't know about playing with my daughter was a crime.

THE COURT: Well, that's for the jury to determine, so I understand that you may be confused as to how it's charged, but this case has been a year and a half. Your attorney has assured me that she has taken depositions and investigated the matter, so we're going to proceed.

THE DEFENDANT: I mean obviously it wasn't investigated that much because—

THE COURT: What is it that you want her to do?

THE DEFENDANT: I wanted actually to find out where those bumps and bruises came from. I want to know. I mean it's not a big deal to anyone else? I mean—

THE COURT: You can't just say in trial somebody else did it. You have to have evidence that someone had an opportunity to do it. They are not going to proceed on that count depending on the evidence in this case. They're just going to proceed with the fact that you pushed her recklessly and it caused her to drown and die. I mean those are

going to be the elections of the State as the evidence proceeds—

THE DEFENDANT: Yes.

THE COURT:—but the Court is not going to grant a continuance at this time.

■ The decision to grant or deny a continuance lies within the sound discretion of the trial court. *State v. Taylor*, 944 S.W.2d 925, 930 (Mo. banc 1997). This Court will reverse the trial court's decision only upon a showing that the court abused its discretion and that Appellant was prejudiced. *Id.*

■ Initially, we note that Appellant failed to make the motion in writing, as required by Rule 24.09.[2] Rule 24.09 provides that a motion for a continuance "shall set forth in writing the facts upon which the motion is based." A motion may only be made orally if the other party consents or the court finds good cause. Rule 24.09. A party's failure to comply with Rule 24.09 is sufficient reason to deny the motion. *State v. Sneed*, 874 S.W.2d 489, 490–491 (Mo.App. W.D.1994). Appellant does not allege that either exception to a written motion existed. Therefore, Appellant's motion was required to be in writing.

Even if Appellant had complied with Rule 24.09, Appellant has still failed to demonstrate that the trial court's denial of the continuance was an abuse of discretion. On appeal, Appellant contends the court erred in denying his request for a continuance because the court erroneously concluded that the State would not proceed on counts where the origin of the bruising on Sophia's scalp would be relevant and the medical examiner had been given Appellant's ring to compare to Sophia's injuries only one week before trial.

Although there appeared to be some confusion as to the State's alternative counts, the court did not deny Appellant's request based on the incorrect belief that the State would not proceed on certain counts. Instead, the court made it clear that the State could elect on which counts to proceed depending on the evidence that would be presented at trial, which is exactly what the State did.

The basis for Appellant's request for continuance was to conduct further "investigation." The court noted that Appellant's case had been pending for over a year and that defense counsel had deposed Turner two months before trial regarding the injuries to Sophia's head. Although Turner had not compared Appellant's ring to Sophia's injuries until the week before trial, defense counsel stated that she had an opportunity to consider Turner's testimony in preparation for trial. Counsel expressed no need for a continuance.

Appellant provided the court with nothing more than a general assertion that additional "investigation" should be done on information that had been available for months. In light of the fact that the cause had been pending for over a year, and that defense counsel indicated that she was prepared to go to trial, the trial court did not abuse its discretion in denying Appellant's motion for continuance made on the day of trial.

■ Furthermore, Appellant has failed to demonstrate that any further investigation would have affected his trial. Defense counsel deposed Turner before trial and counsel expressed no need for a continuance. Appellant has not identified any witnesses he needed to contact or depose, or any experts he needed to retain. Based on the foregoing, Appellant's Point II is denied.

---

2. All rule references are to Mo. R.Crim. P.2010, unless otherwise indicated

*Conclusion*

The judgment of the trial court is affirmed.

ROBERT G. DOWD, JR., P.J. and MARY K. HOFF, J., concur.